IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

```
KERRY G. RIKARD,              )
                              )
            Plaintiff,        )
                              )
      v.                      )   Case No.
                              )   07-3029-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                              )
            Defendant.        )
```

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Kerry Rikard seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in not following the de minimus standard, (2) the residual functional capacity assessment is not supported by substantial evidence, and (3) the ALJ erred in relying on vocational expert testimony which conflicts with the Dictionary of Occupational Titles. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On April 27, 2004, plaintiff applied for disability benefits alleging that he had been disabled since August 11, 2002. However, because plaintiff had a prior disability claim and the

ALJ declined to reopen that case, the relevant time period for plaintiff's new disability claim is April 9, 2004, to the present (Tr. at 16-17, 393). Plaintiff's disability stems from degenerative joint disease of the left shoulder and knee, headaches, and depression. Plaintiff's application was denied on June 22, 2004 (Tr. at 38). On July 7, 2005, a hearing was held before Administrative Law Judge Linda Carter. On September 22, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 22, 2006, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in

2

opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving hee is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the

3

plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4

4. Does the impairment prevent the claimant from doing past relevant work?

>    No = not disabled.
>    Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

>    Yes = disabled.
>    No = not disabled.

## IV. *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Terri Crawford, in addition to documentary evidence admitted at the hearing and afterward.

### A. *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1976 through 2005:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1976 | $ 1,480.06 | 1991 | $23,363.88 |
| 1977 | 1,647.96 | 1992 | 24,547.36 |
| 1978 | 4,602.31 | 1993 | 23,889.77 |
| 1979 | 5,960.65 | 1994 | 24,587.55 |
| 1980 | 11,550.37 | 1995 | 25,603.36 |
| 1981 | 13,832.46 | 1996 | 24,780.58 |
| 1982 | 16,864.16 | 1997 | 27,723.81 |
| 1983 | 18,743.76 | 1998 | 28,530.90 |

5

| 1984 | 19,919.08 | 1999 | 27,272.17 |
|------|-----------|------|-----------|
| 1985 | 20,890.70 | 2000 | 27,494.69 |
| 1986 | 21,589.08 | 2001 | 31,855.74 |
| 1987 | 22,492.22 | 2002 | 20,739.46 |
| 1988 | 22,566.62 | 2003 | 0.00 |
| 1989 | 22,406.62 | 2004 | 0.00 |
| 1990 | 22,725.44 | 2005 | 0.00 |

(Tr. at 74).

**Stipulation for Compromise Settlement**

On May 7, 1998, and August 26, 1999, plaintiff entered into stipulations for compromise settlement with his employer accepting a lump sum payment for an on-the-job injury resulting in a 15% disability to the left knee and a 15% disability to his left shoulder (Tr. at 84, 86). On March 22, 2001, he entered into another stipulation for compromise settlement for a 10% disability to his knee at the 160 week level (Tr. at 87).

**Claimant Questionnaire**

In a claimant questionnaire dated May 6, 2004, plaintiff reported that the following activities make his symptoms worse: walking for more than one hour, climbing, sitting upright for more than two hours, kneeling, crawling, crouching, lifting about shoulder level, and sleeping on his left side for too long (Tr. at 119). He noted he experiences drowsiness from his medication (Tr. at 119). When asked whether he uses a cane, he responded

6

negatively (Tr. at 120). Plaintiff reported he is able to do laundry, do dishes, make beds, change sheets, vacuum, sweep, take out the trash, and mow the lawn (Tr. at 121). He is able to shop for an hour about once a week (Tr. at 121). He prepares breakfast and lunch (Tr. at 121). He cleans bathrooms every three days, vacuums and does laundry every other day, and house cleaning takes up most of his time during the day along with resting between chores (Tr. at 122). He has a valid driver's license and is able to drive if he does not take his medication (Tr. at 122).

**B.**   ***SUMMARY OF TESTIMONY***

During the July 7, 2005, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

**1.   Plaintiff's testimony.**

At the time of the hearing, plaintiff was 45 years of age and is currently 47 (Tr. at 397). He completed 11th grade and did not get a GED (Tr. at 398).

Plaintiff uses a cane in his left hand to help support the weight on his left leg (Tr. at 399). No doctor prescribed the cane, and no doctor is even aware that plaintiff uses the cane (Tr. at 399). Plaintiff drove to the hearing (Tr. at 399). Unless his wife can take him somewhere, he drives (Tr. at 399).

7

Plaintiff has applied for jobs since his alleged onset date;
however, they ask him why he uses a cane or why he limps, and he
never hears back (Tr. at 399).  He's applied for jobs in car
sales and parts sales where he could sit on a stool at a counter
(Tr. at 400).  Even though he has applied for these jobs, he does
not believe he could actually perform them because he cannot
stand for very long (Tr. at 400).  He applied for the jobs
because he is about to go bankrupt and he needs a job (Tr. at
400).  He is getting "very very desperate" (Tr. at 400).
Plaintiff has exhausted his savings and now lives off his wife's
income (Tr. at 400-401).  He has to pay $468 per month in child
support plus medical and dental expenses for his kids, and he has
one child entering college soon that he will have to pay for (Tr.
at 401).

Plaintiff has had three surgeries on his left knee and two
on his left shoulder (Tr. at 401-402).  The surgeries have helped
some with the pain, but they have not cured the problem (Tr. at
402).  He still has restricted mobility (Tr. at 402).  Plaintiff
has pain in his left knee which becomes worse with standing or
climbing steps (Tr. at 402-403).  Sitting with his knee bent
causes problems, but his pain is better if he sits with his feet
elevated and with a pillow under his knees (Tr. at 403).  Cold,
damp weather makes his pain worse (Tr. at 404).  Plaintiff

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 8 of 65

describes his pain as a six or seven with medication on a scale of one to ten (Tr. at 403).

Plaintiff recently had surgery on his right shoulder (Tr. at 401). He said he is doing "as well as can be expected" (Tr. at 401). He has a nervous twitch in his hand, his right arm shakes, his mobility is restricted, he cannot get his wallet out of his back pocket very easily, putting on pullover shirts is troublesome, and he gets sharp pains when he takes a gallon of milk out of the refrigerator (Tr. at 401). Plaintiff has trouble sleeping because he cannot sleep on his side due to shoulder pain (Tr. at 404, 416). He does not need help getting dressed, but he has bought slip-on shoes (Tr. at 405-406).

Plaintiff has dropped things from both hands due to his reduced grip (Tr. at 407-408). He has no trouble holding a pen, but his penmanship is not as neat as it used to be because of the shaking (Tr. at 408).

Plaintiff will lie down with his arms at his sides to help relieve his shoulder pain (Tr. at 410). He also takes anti-inflammatories and pain pills (Tr. at 410).

Plaintiff has problems with his emotions, and he gets headaches (Tr. at 412). He had two headaches in the three days prior to his administrative hearing (Tr. at 412). He has a couple headaches every couple of months (Tr. at 412). Stress

causes the headaches, and they will go away if plaintiff lies down for an hour or two (Tr. at 412-413). He takes Excedrin Migraine for his headaches (Tr. at 413). Plaintiff's emotional problems cause him to cry, to become irritable and angry, to be depressed and just not care (Tr. at 413). Plaintiff started seeing a doctor for his depression in January 2004, but he hasn't seen her in a while because he cannot afford to go (Tr. at 414). He last saw her sometime in 2004 (Tr. at 415). She "kind of" suggested that he see a therapist, but he did not because he "can't afford things like that" (Tr. at 415). Plaintiff has problems with reading because of concentration, and he has problems with his memory (Tr. at 423).

Plaintiff experiences hot flashes, nausea, and constipation from his medication (Tr. at 396-397). He also gets a little groggy and his medication affects his concentration (Tr. at 409). He takes Trazodone to help him sleep, and it leaves him drowsy for a while in the morning (Tr. at 409, 417). Plaintiff usually goes to bed around 9:00 p.m. and gets up around 7:30 a.m. (Tr. at 417).

Plaintiff believes he could sit for 30 minutes to an hour before needing to move or shift because of pain (Tr. at 418). He thinks he could sit for a total of "a couple of hours" during an eight-hour workday (Tr. at 418). He thinks he could stand for 30

10

to 45 minutes at a time and for a couple of hours each workday (Tr. at 418). Plaintiff believes he could walk for about 30 minutes before needing to sit down (Tr. at 404). But he believes he could walk only 50 yards or less (Tr. at 404). Plaintiff uses his cane about 75-80% of the time when he goes out, but he does not use it at home (Tr. at 404). With regard to lifting, plaintiff's doctor told him that if it hurts, don't do it (Tr. at 411). He thinks he could lift five pounds or less on a frequent basis or on an occasional basis (Tr. at 411).

Plaintiff spends his day piddling around the house (Tr. at 419). He makes the bed and does laundry (Tr. at 420). It takes him about 15 minutes to mow his lawn on the riding lawn mower even though it hurts to push on the foot pedal and turn the steering wheel, but he can't expect his wife to do everything (Tr. at 420). When he first gets up, he makes coffee and talks to his wife before she goes to work (Tr. at 420). Then it takes him a couple of hours to get his head cleared out and get over the sick feeling (Tr. at 421). He makes the bed and rests for about 30 minutes afterward, then takes a shower and gets dressed (Tr. at 421). Plaintiff likes to take hot showers "early in the mornings" to try to get the stiffness out. He then puts in a load of laundry, writes out a bill, puts the dishes in the dishwasher, and takes the dogs out (Tr. at 422).

11

Plaintiff does not believe he could work full time because he cannot sit in the car on a road trip for two hours without having to get out and stretch his legs, and "there's just a lot of things I can't do. It's just very irritating and that's a lot of my depression because I can't do things." (Tr. at 422).

**2. Vocational expert testimony.**

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could do no more than sedentary work; could never crawl, crouch, kneel, climb, or work around significant unprotected heights or dangers machinery; could not do commercial driving; should work in a climate controlled environment without temperature or humidity extremes; should not work on uneven surfaces; would need to alternate sitting and standing approximately every 30 minutes; could perform only simple, repetitive tasks; could perform no customer service; and should have no more than minimal contact with co-workers and supervisors (Tr. at 427-428).

The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 428). There would be a small job base that the person could perform, such as final assembler, D.O.T. 713.687-018, with 56,000 jobs in the country and 1,400 in Missouri (Tr. at 429). The person could also be a

12

packager/machine, which is listed in the Dictionary of
Occupational Titles at 920.685-078 as medium unskilled work;
however, there are approximately 100 of these jobs at the
sedentary level in Missouri and 3,000 in the country[1] (Tr. at
429).

The second hypothetical expanded on the first by adding the
requirement that the person should lie down or recline with his
feet at chest level for two to four hours of an eight-hour
workday (Tr. at 430). The vocational expert testified that the
person could not perform any jobs[2] (Tr. at 430).

The third hypothetical included the first but added the
requirement that the person use a cane (Tr. at 430). The
vocational expert testified that the person could still perform
the jobs with a cane unless the person needed to use the cane to
balance while sitting (Tr. at 430-431).

The next hypothetical involved a person who was not able to
concentrate for up to two hours at a time (Tr. at 431-432). The

---

[1]The vocational expert's source for the variance on the
machine packager position was the Unskilled Employment Quarterly
from the United States Department of Labor (Tr. at 429). The
D.O.T. does not address commercial driving, overhead reaching,
even surfaces, sit/stand option, customer service, or contact
with co-workers; that information came from the vocational
expert's experience (Tr. at 429).

[2]This is my interpretation of the testimony, which reads as
follows: "[W]ould that [inaudible] individual be able to return
to, Mr., well, not really return but, return to those other
jobs?" Answer: "No." (Tr. at 430).

vocational expert testified that the person could not perform the jobs of final assembler or machine packager (Tr. at 432).

The final hypothetical involved a person with the same limitations testified to by plaintiff during the administrative hearing (Tr. at 432). The vocational expert testified that such a person could not work (Tr. at 432).

**C.** **SUMMARY OF MEDICAL RECORDS**

On January 21, 2003, plaintiff saw Rodger Moler, D.O. (Tr. at 148-150). Plaintiff reported that "he has just lost it. That he shakes all the time and cries for no apparent reason. His whole life has been turned over and around him. He states that he had knee surgery and then later shoulder surgery. He was told by Dr. David Rogers that he is going to have to find a new type of employment. He states that the financial thing is beginning to close in on him and he has no where to go and nothing to look forward to. He states that occasionally this causes some problems in his home. He states that he is always in pain as a result of the injury and surgery and that it just doesn't seem to get any better. We spent considerable amount of time counseling the patient on resources and options. We have made an appointment with Vocational Rehab counselor and have made some suggestions and recommendations."

14

Plaintiff had some soreness and tenderness with decreased range of motion on the left shoulder. He had gritty crepitance, a crackling or popping sound, in the knees bilaterally. There was no evidence of edema in the upper or lower extremities. Plaintiff was oriented times three with normal mood and affect. Dr. Moler started plaintiff on Lexapro[3] and Ativan[4] on an as-needed basis. He was given samples of Lexapro. On the form completed by plaintiff before his visit, he checked "no" to the question "Do you smoke?".

On February 13, 2003, plaintiff saw Rodger Moler, D.O. (Tr. at 145-147). On exam Dr. Moler noted no edema in the upper or lower extremities. Plaintiff was oriented times three, he had normal mood and affect. Plaintiff was given samples of Zoloft[5] instead of a refill of Lexapro because he complained of "a buzz" with Lexapro. His Bextra[6] was refilled. He was told to use ice packs and participate in physical therapy for his knee. On the form completed by plaintiff before his visit, he checked "no" to the question "Do you smoke?".

_____

[3]A selective serotonin reuptake inhibitor used to treat depression.

[4]A benzodiazepine used to treat anxiety and insomnia.

[5]A selective serotonin reuptake inhibitor used to treat depression.

[6]A nonsteroidal anti-inflammatory.

15

On May 20, 2003, plaintiff was seen by Jacqueline Carter, Psy.D., for personality testing as part of his Comprehensive Vocational Evaluation to assist with vocational planning (2Tr.[7] at 229-232)[8]. The report reads in part as follows:

> Presenting Problem and Pertinent History:  . . .  When questioned concerning vocational limitations, Mr. Rikard reported he cannot do heavy lifting or repetitive movements. He stated the physicians have not given him a specific weight restriction except to say "If it hurts, don't do it." . . . . He reported taking the following medications: Darvocet[9], an anti-inflammatory medication, and Trazodone [an antidepressant] to improve his sleep.
>
> Mr. Rikard reported after smoking for approximately 25 years, he stopped this year and currently smokes approximately one cigar per day. . . .  He stated he experimented with marijuana as a teenager, but denied any illicit drug use since that time. . . .
>
> Mr. Rikard reported he last worked in August, 2002 as an auto body painter.  He stated after two years the job ended when the business closed.  Mr. Rikard reported his longest employment was for 21 1/2 years with the City of Springfield where he was in charge of the body shop.  He reported he was fired and believes the reason was his multiple on-the-job injuries.  However, he stated he failed a drug test, testing positive for THC.  He adamantly denied he was using illicit drugs. . . .

---

[7]Additional records were provided and the pages are number 229-292, although many of the intervening pages are not included. The citations to these pages of the transcript are identified with "2Tr." to distinguish the pages from the original transcript.

[8]The second page of the report was copied with a sticky note on top of it; therefore, portions of five lines are missing (2Tr. at 230).

[9]A narcotic analgesic comprising codeine and acetaminophin (Tylenol).

16

. . . He stated in 1996 following his divorce, he was
diagnosed with depression by his primary care physician and
prescribed Xanax[10], Paxil[11], and Trazodone[12]. He stated he
found the medication to be helpful and continued for
approximately one year. Mr. Rikard reported he had no other
mental health problems until February, 2003 when a physician
told him he could not return to his previous line of work
and would need retraining. Mr. Rikard stated he usually is
not one to cry, but after that he would occasionally break
into tears. He reported his physician prescribed some type
of antidepressant which he took for approximately one month,
but stopped because he does not have health insurance.

. . . When questioned concerning social functioning, Mr.
Rikard reported he enjoys hunting, but is not sure if he can
continue bow hunting due to his shoulder injury. He stated
he also enjoys walking in the woods and watching wildlife.
He stated he and his wife socialize approximately once per
week by visiting with his sister and brother-in-law and
playing cards. When asked his preference for a work
environment, Mr. Rikard reported he can meet the public,
work closely with others or independently.

BEHAVIORAL OBSERVATIONS DURING INTERVIEW AND TESTING

. . . He did not show any evidence of obvious physical
problems or exhibit overt pain behaviors during interview. .
. . Mood appeared mildly depressed. . . .

TEST RESULTS AND INTERPRETATIONS

The Minnesota Multiphasic Personality Inventory-2 was
administered to provide an objective appraisal of
psychosocial/emotional functioning.

A review of the validity scales revealed an invalid profile
as the L scale was elevated to a T score of 70. This scale
is a measure of rather unsophisticated attempts on the part
of the test taker to present himself in a favorable light.

---

[10]A benzodiazepine used to treat anxiety.

[11]A selective serotonin reuptake inhibitor used to treat
depression.

[12]An antidepressant also used to treat sleep disorders.

People who present high on the L scale are typically not willing to admit to even minor shortcomings, and are deliberately trying to present themselves in a very favorable way. There was also an elevation on the F(b) scale, suggesting that Mr. Rikard may have stopped paying attention to the test items that occurred later in the booklet, and shifted to a more random pattern of responding. Therefore, because the profile may not be a valid representation, it could not be interpreted.

SUMMARY AND DISCUSSION

. . . Case history and clinical observation revealed Mr. Rikard to be a serious-minded individual who always defined himself by his work and took pride in his ability to earn a good living for his family. His depression and anxiety appeared to be of an adjustment nature. . . .

DSM IV DIAGNOSTIC IMPRESSIONS

Axis I:    309.28 Adjustment Disorder, with mixed anxiety and
           depressed mood, acute

(2Tr. at 229-232).

On June 5, 2003, Jim Patterson, M.Ed., completed an

Exploratory Job Objective Report (2Tr. at 233-234). The report

reads in part as follows:

Expressed Employment Outcome(s) at time of staffing:

No staffing was held at Mr. Rikard's termination. Mr. Rikard made the decision he did not want to proceed any further with Vocational Rehabilitation services until further medical determinations were made about his knees. He also wanted to see how his Social Security Disability Income (SSDI) appeal was going to be decided in late summer or early fall. Mr. Rikard believed after he knew more about what could be done for his knees (he reported his right knee was beginning to get bad) and he knew about his SSDI, he could proceed with a vocational plan.

* * * * *

18

<u>Vocational Recommendations</u>:
. . . Mr. Rikard also wanted to learn of the results of his
Social Security Disability Insurance claim appeal (most
likely in late summer or early fall of 2003) before making a
vocational decision.

<u>Non-vocational Recommendations</u>:
. . . Mr. Rikard reported several times during his
Evaluation he was in a great deal of pain and in his current
condition he could not sustain full-time employment.  During
his Evaluation Mr. Rikard was never able to complete one
full day, and often he asked to leave early (usually early
afternoon) because he said he was in pain and needed to go
home to relax his knee and shoulder.  Based upon what Mr.
Rikard was reporting, it was evident he did not believe he
was at a point where he could derive a vocational goal and
he would need further medical assessment and treatment to
get to that point.

<u>Vocational Supports, Modifications or Training Strategies</u>:
. . . He may also work best [sic] when with others than
when he is isolated from others.
2.    Based upon observations and Mr. Rikard's personal
physical reports, he should work in a light or sedentary
work setting.  He may be best in a job where he can have the
option to sit, stand or walk to minimize the problems with
his knee.

                    * * * * *

. . . It is recommended he work towards getting his GED
while he waits for further medical resolution and a
determination from Social Security regarding his SSDI claim.

. . . With his knee and shoulder impairment, it would
benefit him to learn the business skills that may be able to
help him blend his knowledge of auto body repair and the
various types of administrative jobs associated with it
(such as writing service contracts, estimating, ordering
parts, etc.).  It is recommended Mr. Rikard pursue further
training to learn skills which would be compatible with his
disability, such as business, office management, computer
skills, etc.

(2Tr. at 233-237).

19

On September 11, 2003, plaintiff saw Ted Lennard, M.D., of the Springfield Neurological and Spine Institute (2Tr. at 284-287).  Plaintiff reported he was taking Bextra[13], Propoxyphene-N[14], Trazodone[15], and Zoloft[16].  He said "he smokes a pack of cigarettes a day and has for 20 years."  Dr. Lennard observed that plaintiff ambulated with a limp but used no assistive device.  "He attempts walking on his heels and toes, but complains of pain in his knees when on his toes, and does not perform this task.  When asked to squat, he declines for fear of pain in the left knee."  Plaintiff had normal range of motion in his cervical spine, thoracolumbar spine, upper extremities, and lower extremities.  "Actively, Mr. Rikard was only able to abduct the shoulder to 120° and flex to 130°.  When I ranged the shoulder passively, he did complain of pain, but he had full motion [150°]."  Plaintiff's hand could be fully extended, he could make a fist, his fingers could be opposed.  He had normal fine finger movements.  He had normal strength throughout except he had 4+/5 left shoulder abduction and 4+/5 right knee extension.  Straight leg raising was negative.  His right thigh

_____

[13]A nonsteroidal anti-inflammatory.

[14]A narcotic analgesic.

[15]An antidepressant also used to treat sleep disorders.

[16]A selective serotonin reuptake inhibitor used to treat depression.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 20 of 65

was 1.5 cm smaller than the left, and slight atrophy was noted in the parascapular muscles of the left shoulder compared to the right.

That same day, Dr. Lennard completed a Medical Source Statement Physical (2Tr. at 288-292). He found that plaintiff can occasionally lift 20 pounds and frequently lift ten pounds, stand or walk at least two hours per day, sit for about six hours per day, and is limited in his ability to push or pull with his upper extremities due to decreased active range of motion in his left shoulder. He found that plaintiff can occasionally balance and stoop but can never climb, keel, crouch, or crawl. He found that plaintiff can only occasionally reach with his left shoulder, but otherwise has no manipulative limitations. He found that plaintiff has no visual, communicative, or environmental limitations. The form states that plaintiff claimed he has to elevate his feet due to swelling and asked the doctor to comment. Dr. Lennard wrote, "He denies swelling in the lower extremities today and in the recent past. No swelling noted on exam."

On December 16, 2003, plaintiff saw Samuel Crow, II, D.O., to establish care (Tr. at 156-157, 161-162). He complained of chronic pain in the left knee and left shoulder. "He tells me he is trying to get disability due to the fact he is uneducated (no

21

high school education), and despite vocational education, appears to have minimal opportunities given his orthopedic complaints." Plaintiff reported that he smokes at least one pack of cigarettes per day. Plaintiff's mental status was within normal limits. "Musculoskeletal examination reveals rather considerable discomfort and substantial loss of mobility in the left shoulder area. X-rays taken of the left shoulder reveal partial excision of the clavicle and the patient is unable to fully flex[17], extend, abduct[18], or adduct[19] his left shoulder. Internal and external rotations are also extremely limited in [that] the patient guards his left nondominant arm carefully during the examination. . . . Left knee . . . appears quite stable to my examination. Now the patient indicates he is having right knee problems. This knee examination is essentially normal."

Dr. Crow assessed (1) left knee dysfunction with multiple surgeries, (2) left shoulder dysfunction with status post surgery and partial clavicle excision, (3) multiple orthopedic complaints and arthritic type of symptoms in a relatively young man requires further evaluation, (4) depression/anxiety secondary to knee and shoulder problems and by self-report, and (5) insomnia. Dr. Crow

---

[17]Lifting the arm in front of the body until the arm is directly overhead pointing up.

[18]Lifting the arm at the side as high as possible.

[19]Moving the arm across the front of the body.

22

referred plaintiff to an orthopedic doctor. "He tells me he is 'trying to get disability', which is really a shame in such a young man. Of course we will leave this determination up to the orthopedic department since this is his primary potentially disabling condition." Dr. Crow refilled plaintiff's Bextra[20], Darvocet-N[21], and Trazodone[22]. He prescribed a Medrol dosepak [steroid] for inflammation and ordered blood work and a urinalysis.

On January 8, 2004, plaintiff saw Thomas Kelso, II, M.D., at St. John's Clinic for bilateral shoulder pain and bilateral knee pain after having been referred by Dr. Crow (Tr. at 173-175). Plaintiff reported difficulty sleeping on his side and lifting his arm above his head. Plaintiff reported that most of his knee pain is precipitated by prolonged sitting and negotiating stairs. He rated his pain as an eight on a scale of one to ten. Plaintiff reported that he exercises weekly by walking; he has smoked a pack of cigarettes of day for 21 years. His physical exam was normal except his shoulders and knees, he had normal mood and affect. Plaintiff had almost full active range of motion but with pain in the terminal phases of motion. He had

---

[20]A nonsteroidal anti-inflammatory.

[21]A narcotic analgesic comprising codeine and acetaminophin (Tylenol).

[22]An antidepressant also used to treat sleep disorders.

23

positive Hawkins[23] and Neer[24] impingement maneuvers, mild AC joint
tenderness and pain with horizontal crossover maneuver.  X-rays
of the right knee and right shoulder were normal.  "I have
concerns whether this patient would be a good surgical patient
given his track record with the previous knee and shoulder
surgeries."  Dr. Kelso recommended a right shoulder injection of
Kenalog (a steroid) with local anesthetic and left knee Synvisc[25]
injection series.

On January 15, 2004, plaintiff saw Todd Dean, a physician's
assistant at St. John's Clinic (Tr. at 171).  "He was injected at
this last visit with a cortico-steroid injection.  The patient
states he had about two days of benefit from injection and then
decided to go hunting and killed a varmint and carried it about
400 yards, about a 30 pounds animal, dragging it back home.  The
next day he awoke with a lot of pain to the front [and] back of
his shoulder. . . .  He is taking a lot of pain medications and
he says it doesn't touch the pain."

---

[23]Pain suggests shoulder impingement.

[24]Pain suggests shoulder impingement of posterior cuff.

[25]Hyaluronan, the name of the substance in Synvisc, is
secreted by cells in the cartilage of joints. Hyaluronan is one
of the major molecular components of joint fluid, and it gives
the joint fluid, also called synovial fluid, its viscous,
slippery quality. The high viscosity of synovial fluid allows for
the cartilage surfaces of joints to glide upon each other in a
smooth fashion. Some people consider injecting Synvisc in a knee
to be a so-called joint lubrication.

24

Plaintiff was given his second Sinvisc injection in his right shoulder, and he was sent for a right shoulder MRI (Tr. at 184-185).

On January 22, 2004, plaintiff saw Todd Dean, a physician's assistant at St. John's Clinic, and received his third Synvisc injection (Tr. at 168). "He was injected on the 15th of January subacromial injection which he received good benefit with for 2 to 3 days except when he decided to carry the bob cat over an open field which caused pain in the right shoulder." Plaintiff had positive Hawkins, positive Neer's and positive tenderness to palpation to the AC joint. Mr. Dean assessed left knee osteoarthritis, right shoulder impingement and AC joint arthrosis, right shoulder bursitis, and right shoulder tendinitis. Plaintiff was told to follow up in six weeks for another injection.

On February 2, 2004, plaintiff saw Ron Ellis, M.D., at St. John's Pain Management Center after having been referred by Dr. Thomas Kelso (Tr. at 199-201). Plaintiff said that his pain was made worse with sitting, standing, walking, lifting, crawling, squatting, kneeling, and weather changes; it was relieved by rest. Plaintiff reported smoking a pack of cigarettes per day. On exam Dr. Ellis found no edema in upper or lower extremities, "no apparent upper or lower extremity muscle wasting."

25

Plaintiff's gate was slow and somewhat stiff. He had mild tenderness along the medial joint line on the left, but no effusion (a collection of fluid), crepitus (a crackling sound), or apparent instability. Plaintiff had decreased shoulder range of motion, was able to extend forward and laterally to about 90°, could not reach overhead on the left.

Dr. Ellis diagnosed multiple joint pain and tobacco use. He referred plaintiff to the multidisciplinary pain program to assist with teaching him how to cope with chronic pain; and he prescribed Mobic (a nonsteroidal anti-inflammatory) and methadone (a narcotic pain reliever similar to morphine) for pain. He recommended bilateral suprascapular nerve blocks[26].

On February 12, 2004, plaintiff saw Ron Ellis, M.D., for bilateral shoulder pain (Tr. at 198). Dr. Ellis performed a bilateral suprascapular nerve block and told plaintiff to follow up in three to four weeks.

On March 16, 2004, plaintiff saw Crystal Webb, R.N., in the St. John's Pain Management Center (Tr. at 197). Plaintiff reported that he got no relief of left shoulder pain with the scapular nerve blocks from a few weeks earlier, but he did get some improvement of right shoulder pain so that he was able to lie on that shoulder. "He is really hesitant to do physical

---

[26]The injection of a local anesthetic and steroid.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 26 of 65

therapy, even after his shoulder surgery.  He has had therapy.
Actually what he did was minimal because of pain.  He is fairly
fearful of the left shoulder, because Dr. Rogers told him that if
he overused it he would significantly impinge."

Plaintiff reported he got good relief with methadone;
therefore, Dr. Ellis refilled the methadone.  Ms. Webb suggested
plaintiff try Arthrotec (a nonsteroidal anti-inflammatory).  "He
is to start physical therapy by [his four-week follow up] and at
least give it a try."

On March 19, 2004, plaintiff was evaluated by Colleen Baker
at the Center for Pain Management due to stress headaches and
bilateral shoulder and knee pain (Tr. at 194-196).  Plaintiff
reported that in 1996 he hopped over a fence to inspect a water
sewer main and his left knee popped.  In 1998 he was lifting
something and his left shoulder popped.  In 2000, he was working
in the body shop for the city, stepped off a truck and his leg
popped.  Plaintiff had multiple surgeries on his knees and
shoulders after each of these on-the-job injuries.  Plaintiff
said that in 2003 Dr. David Rogers told plaintiff he could no
longer perform repetitive motion and no lifting over ten pounds.
Plaintiff said he tried to go to vocational rehabilitation but
did not have enough education.  Plaintiff reported he was kicked
out of vocational rehabilitation two months before he was to

27

graduate because "[a] foreman had not filled out the paperwork for him on some vocational courses he was taking." Plaintiff was smoking one pack of cigarettes per day. He said his pain is worse with cold, damp weather; extensive use; walking; sitting for too long. Plaintiff relieves his left knee pain by sitting in a recliner with a pillow under his knee. Plaintiff was taking Trazodone, methadone, over-the-counter Excedrin Migraine three to four times a week, and an unidentified anti-inflammatory. "He also reports that he is stressed out. He is trying to get disability. He has not worked since August of 2002. He has lots of financial concerns."

Plaintiff's shoulder flexion was 80° on the left, 106° on the right (normal is 180°). Shoulder abduction was 90° on the left, 95° on the right (normal is 180°). "He has very poor scapulohumeral rhythm and in fact moves his upper extremities incorrectly into an impingement-type pattern on shoulder elevation maneuvers. . . . This can be increasing his problems with his shoulders." Ms. Baker recommended a physical therapy plan and also recommended plaintiff talk to his doctor about getting an unloader brace[27].

---

[27]Unloader braces are relevant where arthritis affects one half of the joint. They are designed to take the load off the damaged side and transfer it to the undamaged side.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 28 of 65

On March 19, 2004, plaintiff was seen by Deborah Kukal, Ph.D., with the Center for Pain Management to assess psychological factors which may be actively contributing to the etiology, maintenance, and intensity of plaintiff's chronic pain (Tr. at 190-193). Her Individual Needs Assessment reads in part as follows:

> The evaluation consisted of clinical interview, the Behavioral Health Questionnaire, the Marlowe Crowne, the Tellegan Absorption Scale (TAS),the Multiaxial Diagnostic Inventory-Revised-Adult Clinical Scales (ACS), and the Multidisciplinary Pain Inventory (MPI).

> * * * * *

> PAIN HISTORY:  The patient arrived on time for his appointment.  He engaged in significant pain behaviors on the way back to the office and as he began this session. However, as the session continued, his pain behaviors did decrease. . .

> Patient is currently trying to obtain disability.  Patient did go to vocational rehabilitation at one point.  He was told by them "I could be a ticket taker - and I'm an artist at what I do".  Patient began to cry at that point.  He described himself as being an artist with various hand work including building and painting cars and was very distressed at the idea that he would be able only to take tickets at a movie theater. . . .

> The patient does appear to be a past workaholic who used his work to avoid his internal distress and who is now, in his words, "all used up".  He experiences himself as a victim both in relation to his father and also in relation to his second wife.  He does not experience himself as a victim with his current wife, but he does experience significant guilt because she is caring for him.  The patient tends to deal with his guilt by depriving himself.  For instance, he went without medical care for a year because he felt that his needs were a burden to her.

29

. . . Patient is very much against antidepressants[28] because "it's a sign of weakness". However, he is in significant need of [an] antidepressant and he has stated that he will contact Dr. Crow to request antidepressants.

TESTING RECEIVED:

Marlowe Crowne: The Marlow Crowne scale measures a person's tendency to use repressive coping skills. . . . [T]his patient does appear to have some level of repressive coping which may be influencing his physiology and intensifying his pain experience. The patient is aware to a certain extent of these tendencies. He did state in session "I used to have a temper, now I turn it inward". However, this recognition in and of itself is an indicator that his repressive coping is not complete or extreme.

Tellegen Absorption Scale: The TAS is a brief self-report inventory which measures an individual's openness to experience and is an indicator of how a person may respond to mind/body health interventions. With a raw score of 6, this patient does not acknowledge experience of his internal world that might enable him to easily access mind/body interventions. However, the patient's statement that antidepressants were the sign of "weakness" and his level of depression may also have impeded his sensitivity beyond his normal experience.

Symptom Checklist: The Symptom Checklist is a self-report checklist which follows the symptom classification of the DSM-IV. Patients endorse symptoms relating to dysthymia, major depressive disorder, posttraumatic stress disorder, anxiety and panic. After the patient makes the self-report, the examiner then further questions to clarify the meaning and intensity of the symptoms. Patient endorsed virtually every symptom of depression and most symptoms of anxiety. He was overtly depressed during the session, with crying and verbal expressions of hopelessness. . . .

Multidimensional Pain Inventory: The MPI is a self-report instrument which assesses a patient's typical pain coping

_____

[28]The records reflect that plaintiff had taken antidepressants as early as 1996 and was currently on antidepressants when this statement was made. At this point, plaintiff had taken Trazodone, Zoloft, Paxil, Xanax, and Lexapro.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 30 of 65

pattern.  This patient received a hybrid profile on the MPI.
He experiences significant interference from his pain and
his most notable score is his extremely low level of a sense
of control over his own life.  He experiences himself as
having lost control of his life, something he is aware of
consciously as well as something which appears on his
testing profile.  In addition, this patient has a high level
of punishing responses.  A high level of punishing responses
that is frequently associated with trauma and/or early abuse
. . . can indicate that the patient feels that he or she
somehow deserves the pain they [sic] are experiencing.

PSYCHOLOGICAL TREATMENT INDICATORS:  . . .  He now
experiences himself as [a] helpless victim who must be cared
for by others, yet he also feels great destain [sic] for
himself in this position.  This patient is at risk for
developing suicidal ideation.  He does state that he has
spiritual resources which prevent him from trying suicide. .
. .

TREATMENT RECOMMENDATIONS: . . .
1.    This patient is in grave need of an antidepressant
      medication.  I did speak with him about that.  We
      discussed his experience of shame and self-loathing
      that he would need an antidepressant in his sense of
      weakness and worthlessness. . . .
2.    I would recommend that this patient be included in the
      next available session of our intensive chronic pain
      treatment process.
3.    Once the patient has begun to stabilize, I would
      recommend individual psychotherapy should he be willing
      to enter into that process.

INTENSIVE CHRONIC PAIN TREATMENT PLAN
. . .  This patient will be treated most effectively within
an intensive group treatment process to address specific
aspects of coping with chronic pain by learning to manage
anger, depression, anxiety and stress stemming from chronic
pain, as well as learning techniques for emotional self-
regulation of psychophysical responses to stress which are
exacerbated by chronic pain. . . .

While the patient is involved in this treatment process, it
is expected that the patient will be actively engaged in
appropriate exercise at a level to be determined by
consultation with a physical therapist.

On March 25, 2004, plaintiff saw Todd Dean, a physician's assistant at St. John's Clinic (Tr. at 167). Plaintiff complained of bilateral shoulder pain. "He says at this time his right shoulder is not bothering him. He is able to do things and doesn't feel he is a candidate for any type of surgical intervention to the right shoulder. He also states his left shoulder is not a candidate as well. He feels that an injection at this time when offered was not an option."

On exam plaintiff was able to lift his arm above his shoulder, internally rotate and extend to his sacrum, externally rotate and forward flex to the side of his head. Mr. Dean assessed right shoulder impingement and AC joint arthrosis, improved compared to the left. "The patient at this time does not wish to have intervention." The recommendation was to follow up with physical therapy and psychiatry.

April 9, 2004, is plaintiff's alleged onset date.

On April 23, 2004, plaintiff called Dr. Crow's office for a refill of Paxil (Tr. at 155).

On April 30, 2004, Ron Ellis, M.D., with the Center for Pain Management prepared a progress report (Tr. at 188-189). The report reads in part as follows:

> SUBJECT INFORMATION: The patient reports on his last visit that his pain level is a 6. He is starting to do more exercise. He is trying to work on increasing his activity without doing a lot of heavy repetitive type movements that

would increase wear and tear on his joint.  He does seem to be more receptive to exercise and he intends to continue with the wellness program as well.  He also attended nine sessions with zero absences.

* * * * *

PLAN:  Patient is going to work on the post rehab program independently for a period of 2-4 weeks and then should benefit from specific exercises for the left shoulder and knee as he becomes a more active participant in his recovery.  He also may benefit from an unloader type of brace for his knee and this should be addressed with his orthopedic physician.

On May 4, 2004, plaintiff saw Crystal Webb, R.N., with the Center for Pain Management (Tr. at 354).  "He is taking two methadone per day and just has some days that his pain is very poorly controlled.  He feels like he has gotten a great deal of benefit for [sic] our chronic pain program, however, and feels like the methadone that he is using is better than having anything else that he has had for pain.  Using the methadone he is actually able to mow his yard with a push mower.  He is actually able to have a better quality of life."

Plaintiff's methadone dosage was increased and he was told to continue with the chronic pain program and continue physical therapy.

On May 11, 2004, plaintiff saw Samuel A. Crow, II, D.O. for a follow up on headaches and chronic pain syndrome (Tr. at 154-155).  Dr. Crow noted that plaintiff is not a candidate for surgery on his shoulder until he is off his methadone.

33

Plaintiff's physical exam was normal, and his mental status was within normal limits. His blood pressure was 120/85. Plaintiff had reported that when he has a headache, his blood pressure is 143/106 with a pulse of 116. Dr. Crow assessed chronic pain syndrome, chronic headache, multiple orthopedic complaints and concerns per chart, and chronic constipation secondary to methadone. He ordered blood work, gave plaintiff a prescription for lactulose for constipation, and recommended he follow up with the pain center.

On May 28, 2004, R. Tiede, R.N., saw plaintiff in the headache management program at St. John's Mercy Center for Pain Management (Tr. at 295). It was recommended that plaintiff walk for 30 to 45 minutes five to seven times per week.

On June 8, 2004, plaintiff saw Crystal Webb, R.N. (Tr. at 311). Plaintiff reported his shoulder and knee pain was much improved with the methadone. "He continues to be able to do his side activities of daily living as well as increasing his activities in the yard. He was placed on Arthrotec[29] which gave him a great deal of relief in his right shoulder pain but the insurance company would not purchase the medication. . . . He gets good relief with his medications." Ms. Webb talked to Dr.

_____

[29]A brand name medication which is a combination of Diclofenac, a nonsteroidal anti-inflammatory, and Misoprostol, which replaces protective substances in the stomach that are inhibited by nonsteroidal anti-inflammatory drugs.

34

Ellis who increased plaintiff's methadone as needed for pain, added Diclofenac[30] with Cytotec[31] daily for pain instead of the Arthrotec, a brand-name drug comprised of Diclofenac and Cytotec.

On June 8, 2004, plaintiff saw Volare Yantis, M.D., for headaches (Tr. at 260-261). "The patient is ambulatory, with a normal gait." Dr. Yantis assessed chronic headache, chronic pain syndrome, and depressive disorder. Plaintiff was told to stop using so much Excedrin Migraine. He was switched from Paxil[32] to Effexor (an antidepressant) and a sample pack was given.

Plaintiff failed to show up for a 9:00 a.m. appointment in the headache management program (Tr. at 284). Plaintiff was called and he reported that he overslept.

On June 21, 2004, Lester Bland, Ph.D., a Clinical Psychologist, completed a psychiatric review technique (Tr. at 202-215). Dr. Bland found that plaintiff's mental impairment (affective disorder) was not severe. His disorder was depressive reaction to pain, physical changes, and limitations which resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties

_____

[30]The nonsteroidal anti-inflammatory found in the Arthrotec which worked well for plaintiff.

[31]Brand name for Misoprostol, the substance found in the Arthrotec which worked well for plaintiff.

[32]A selective serotonin reuptake inhibitor used to treat depression.

35

in maintaining concentration, persistence, or pace; and no episodes of decompensation.

On June 28, 2004, plaintiff had his last nurse visit with the headache management program (Tr. at 284). Plaintiff had no headache but complained of other pain and stress. "States he is pretty stressed out now due to finances, being denied again for disability, and fighting with ex-wife." Plaintiff was reminded to use relaxation techniques and coping skills he has learned to deal with stress.

On June 28, 2004, R. Tiede, R.N., completed a discharge nurse report from the headache management program at St. John's Mercy Center for Pain Management (Tr. at 282-283). The nurse noted that plaintiff had met his goals on water intake, nutrition, caffeine reduction, trigger reduction re: stress, exercise, and medication. He had not met his goals on stress management ("very stressful time - using coping skills, very depressed") or tobacco reduction/elimination ("no change"). Plaintiff reported that the number and intensity of headaches had gotten better.

On June 29, 2004, plaintiff saw Volare Yantis, M.D., for a follow up on headaches (Tr. at 259). "Overall he states he has noted a significant improvement, both in intensity and frequency; this is despite increased stressors at home. Plaintiff was

36

encouraged to continue on Effexor[33] and continue with the pain center."

On July 19, 2004, plaintiff saw Volare Yantis, M.D., for a following up on his headaches (Tr. at 258). "Overall, he states they are doing well. He reports there has been no major headache flare ups and that they are minimal if they do occur. He continues to see Dr. Kukal over at the pain center for psychotherapy and feels this is very helpful." Dr. Yantis recommended plaintiff continue on the Effexor and continue with lifestyle modifications.

On August 3, 2004, plaintiff saw Crystal Webb, R.N., at the St. John's Pain Management Center (Tr. at 278-279, 352-353). "He has had a severe exacerbation of his right shoulder. He states that he was out fishing and was throwing a very light weight anchor into the water to anchor where they were fishing at and since that time he felt something give in his shoulder and he has had severe and intractable pain." Plaintiff reported having depression problems, but said the Effexor prescribed by Dr. Yantis was helping his headaches and he was starting to feel better. Plaintiff got refills on his narcotics.

On August 6, 2004, plaintiff saw Ronald Pak, M.D., with St. John's Spine Center (Tr. at 276-277). "He has been quite

_____

[33]An antidepressant.

37

depressed regarding his pain and limitations.  Activities are fairly sedentary.  He is applying for disability. . . .  Smokes one pack of cigarettes per day.  He has been counseled on detrimental effects of smoking on musculoskeletal and overall health.  Does not drink alcohol.  He tries to walk on a daily basis for exercise."

Dr. Pak performed a physical exam and then listed the following impression:  "Chronic pain syndrome with shoulder/upper body pain and left knee pain. He seems significantly depressed. He probably does have significant arthritic problems and limitations, but his degree of pain and debility seems out of proportion to what would be expected from physical reasons alone. He is having difficulty coping and is reliant on medication for pain.  He does not feel that he can improve functionally.  He does not feel that he can return to any kind of work, therefore, prognosis for vocational return appears poor.  He should continue with cognitive therapies to try to gain insight and control over his situation.  Continue with walking, ROM and gentle strengthening as able."

On October 4, 2004, plaintiff saw Thomas Kelso, M.D., an orthopedic specialist (Tr. at 255-256).  Plaintiff reported that about four to six weeks ago, he was throwing underhanded an eight-pound weight and had acute increasing pain in his right

38

shoulder. He said he got no significant improvement from the subacromial injection six weeks earlier. Dr. Kelso recommended plaintiff be treated by the Pain Management Clinic, and stated that surgery is likely not in plaintiff's best interest.

On October 26, 2004, plaintiff saw Crystal Webb, R.N., with St. John's Pain Management Center (Tr. at 273-274, 350-351). "The patient comes in today very upset with Dr. Kelso's lack of compassion. . . . He is also having some increasing problems with his left knee; however, the visit with Dr. Kelso has left him so angry and upset, he is not wanting any further contact with Dr. Kelso, and he saw Dr. Ronald Pak for rehabilitation." Ms. Webb recommended another MRI of plaintiff's shoulder. His methadone was refilled.

On November 30, 2004, plaintiff saw Todd Harbach, M.D., an orthopedic surgeon, due to right shoulder pain (Tr. at 250-251, 363-364). "He previously had two left shoulder surgeries performed by Dr. Rogers in the Cox system. These were both subacromial decompressions and distal clavicle excisions. He has done pretty well with that. He is now here with the same syndrome on the right side." Plaintiff was taking Methadone[34],

---

[34]A narcotic pain reliever similar to morphine.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 39 of 65

Misoprostol[35], Diclofenac[36], and Effexor[37].  He reported walking,
doing stretches, and relaxation exercises daily.  He said he was
smoking a pack of cigarettes per day and had for 20 years.  Dr.
Harbach examined plaintiff and assessed right shoulder pain,
right shoulder impingement syndrome, right shoulder AC joint
arthrosis, and partial thickness rotator cuff on the right.

On December 22, 2004, Todd Harbach, M.D., an orthopedic
surgeon, performed a right shoulder arthroscopy (Tr. at 247,
361).

On January 25, 2005, plaintiff saw Dr. Harbach for a follow
up (Tr. at 246, 360).  Four weeks after his right shoulder
arthroscopy, plaintiff had good motion.  "At this point, he is
very pleased.  He has plenty of pain medicine to help with his
discomfort."  Plaintiff reported that he had been working on
range of motion activities at home "as he states that he had to
perform therapy on his left shoulder."  Plaintiff was oriented
times three, and he had normal mood and affect.  He could elevate
his arm to 95-100°.  "We urged him to be cautious with his
activities with his right arm.  It is reasonable for him to work
on range of motion and strengthening.  At this point, he should

_____

[35]Replaces protective substances in the stomach that are
inhibited by nonsteroidal anti-inflammatory drugs.

[36]A nonsteroidal anti-inflammatory.

[37]An antidepressant.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 40 of 65

go slow and not aggravate the tissues."

On January 27, 2005, plaintiff saw Crystal Webb, R.N., at St. John's Pain Management Center (Tr. at 263, 348). "The patient still does not believe that the methadone is covering his left knee pain. He states that left knee pain is severe and intractable and makes it very difficult for him. He states he is unable to stand for any length of time, sit for any length of time. He has undergone our miltidisciplinary chronic pain program. He has also seen Dr. Pak in the past. He was asking us today to fill out his disability paperwork; however, I explained to him that Dr. Ellis does not deal in disability. We do not do disability determinations nor we would [sic] do disability ratings. It is our hope at this point that this patient would in some way learn how to cope with his medications and his pain enough that he would be able to return to work. The patient does not feel like that is going to be reasonable."

Plaintiff walked with a severe antalgic gait[38] and complained of left knee pain. He was able to flex and extend the knee with complaints of pain. "I talked to Dr. Ellis for continuing his methadone as prescribed. I would like to add some

---

[38]A characteristic gait resulting from pain on weightbearing in which the stance phase of gait is shortened on the affected side.

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 41 of 65

Neurontin[39].  Actually, the Neurontin will take care of his knee
pain.  He will be seen back in the Refill Clinic in 12 weeks.  We
will see him back in 6 months.  Hopefully in 6 months, the right
shoulder pain would be better, and some of his disability stuff
will be behind him.  I think that actual disability process has
forbidden this person from being able to have a successful
resolution from his pain."

On March 8, 2005, plaintiff saw Todd Harbach, M.D., for an
orthopedic recheck (Tr. at 245, 358).  "He is now approximately 2
1/2 months status post right shoulder arthroscopy.  He presents
back today doing pretty well.  He states that the shoulder is
doing pretty well.  He still has some discomfort with various
activities.  The biggest concern he has is the inability to get
into his back pocket. . . .  He states that financially he is not
able to go to physical therapy.  He states that over the last
eight years he has had multiple episodes of physical therapy and
he knows pretty much what he needs to do and he has been doing a
great deal of that at home."

Plaintiff had a normal mood and affect.  He could abduct his
shoulders to 85°.  "I urged him to be cautious with his
activities as he may be overdoing it.  He should ice and perform

---

[39]Neurontin affects chemicals and nerves in the body that
are involved in the cause of seizures and some types of pain.
The exact way that it works is unknown.

the modality treatments before and after his workouts.  I
strongly suggested that he attend physical therapy, but he states
that financially he is not able to afford that.  He will continue
to see Crystal Webb in the spine center.  I spoke with him at
length about the Methadone that he is taking, that it is very
habit forming and that he should begin tapering himself off the
Methadone.  He states that he cannot exist without taking that
for pain.  At this point I discussed with him to continue
physical therapy at home and ice.  If he decides that he would
like to attend physical therapy that we would gladly set him up
with an appointment for that."

On June 21, 2005, plaintiff saw Ron Ellis, M.D., at the St.
John's Pain Management Center (Tr. at 373-374).  His last visit
with the Pain Management Center was with Crystal Webb on January
27, 2005.  "Today he reports that he underwent right shoulder
arthroscopic surgery on 12/22/04 by Dr. Harbach.  He claims that
he got 50% relief of pain, but ever since the surgery he has had
decreased range of motion.  He last saw Dr. Harbach on 3/8/05. .
. .  Currently for control of symptoms he takes methadone 10 mg
up to four per day, with overall good effect without side
effects.  When he was seen back in January he was also prescribed
a trial of Neurontin, but because of expense[40] he never even got

_____

[40]Plaintiff's medical records for this visit indicate that
he was insured through Premier PPO, his wife's health insurance

43

it filled."

On exam, Dr. Ellis found "very mild" right anterior joint tenderness. Range of motion was limited to 90° with forward extension and lateral abduction. He was able to reach behind his back. Plaintiff had "mild tenderness" in his knees. Dr. Ellis assessed multiple joint pains, tobacco use, and chronic opioid tolerance/dependence. He continued plaintiff on his current medications.

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Linda Carter entered her opinion on September 22, 2005 (Tr. at 16-25).

Step one. Plaintiff has not performed substantial gainful activity since April 9, 2004 (Tr. at 17).

Step two. Plaintiff has severe impairments of history of multiple knee and shoulder surgeries characterized as chronic pain syndrome, and history of adjustment reaction to physical conditions with depression (Tr. at 22). He has a non-severe impairment of history of mixed type headaches controlled with treatment (Tr. at 22).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17).

---

(Tr. at 369).

44

Step four.  Plaintiff's subjective complaints are not credible (Tr. at 18).  In support of this finding, the ALJ wrote the following:

He was assessed by his treating orthopedist at the time, David Brown, M.D., to reach maximum medical improvement as of June 1997, with 12% permanent partial disability of the lower extremity resulting in 5% disability of the whole person.  He returned to full-time employment thereafter.  He was able to return to his regular job on a full duty basis in June 2000 following arthroscopy in April 2000.  He sought further medical treatment in 2002 for knee complaints. . . . Dr. Frewin recommended to him that he attend physical therapy, which the claimant refused, opting to do his own therapy at home.  The claimant also has a medical history of 2 arthroscopic surgeries in 1998 and 2003 of his left shoulder . . . without complication.  He was treated by his family doctor, Rodger Moler, D.O., from June 2002 through September 2002, with conservative care for chronic pain complaints of his knee and left shoulder.  He was only seen twice in 2003 by Dr. Moler.

Relative to the time period at issue herein, the claimant developed right shoulder complaints of pain and limited range of motion in the spring of 2004.  He commenced care at the St. John's Pain Center in February 2004.  In addition to chronic pain relating to his shoulders and knee, he complained of having 2-3 severe headaches per week.  He was treated by Dr. Yantis for headache management.  By July 2004, Dr. Yantis noted that he was "doing well".  The claimant had had no major headache flare ups, and . . . his headaches were minimal if they did occur. . . .

. . .  Although the claimant has alleged herein that he has adverse side effects from medication of drowsiness, he was noted not to have such side effect, and consistently denied oversedation, in the Pain Center records. . . .  Dr. Pak opined, "He probably does have significant arthritis problems and limitations, but his degree of pain and debility seems out of proportion to what would be expected from physical reasons alone." . . .

. . .  The claimant underwent arthroscopic surgery on December 22, 2004.  In his 4 week post surgery check up, the

45

claimant had good motion.  Dr. Harbach noted, "At this
point, he is very pleased". . . .  The claimant declined Dr.
Harbach's suggestion of physical therapy, saying he had a
history of multiple physical therapy sessions, "knows pretty
much what he needs to do and is doing a great deal of
physical therapy at home, i.e., pulley systems, mild
strengthening exercises, and ball exercises for range of
motion."

. . .  In follow-up on January 27, 2005, the claimant
requested completion of disability papers relating to his
claim herein, which was denied. It was noted in the medical
records, "I think that actual disability process has
forbidden this person from being able to have a successful
resolution from his pain." . . .  The medical evidence in
this matter does not support the claimant's statements of a
disabling degree of subjective complaints and functional
limitations.

. . .  [T]he claimant engages in a fairly routine daily
lifestyle.  Although not working outside the home, the
claimant does household maintenance activities, such as
laundry, dishes, making beds, vacuuming and sweeping,
cleaning (including bathrooms), taking out the trash and
mowing the lawn.  He shops weekly with his wife.  He cares
for the family pets.  He prepares meals for himself during
the day without any difficulty.  He manages finances.  He is
able to drive.  The claimant reported these activities as of
May 6, 2004.  The claimant testified that he cannot lift as
much as a gallon of milk, drops things with both hands, and
uses a cane 75-80% of the time.  He would not be able to
engage in these reported daily living activities with such
limitations.  While the claimant testified that he has to
use a cane the majority of the time, there is not evidence
in the medical records that this is medically necessary or
prescribed.

. . .  The undersigned takes administrative notice from the
administrative law judge Decision of April 8, 2004, however,
that the claimant decided to forego vocational
rehabilitation because "he wanted to see how his Social
Security Disability Income (SSDI) appeal was going to be
decided..."  The evidence overall indicates that the
claimant has tended to forego beneficial therapies and
services and focused more upon obtaining disability
benefits, which raises a question of secondary gain in this

46

matter.  The undersigned notes there to be other medical
records in evidence in the claimant's prior claim of
disability which the claimant has not submitted into
evidence in the claim at issue herein i.e., reports from Dr.
Lennard and Dr. Carter, which contain information which does
not support the claimant's statements concerning subjective
complaints and functional limitations.  Upon administrative
notice of the administrative law judge Decision of April 8,
2004, the undersigned notes that the claimant acknowledged
that he was fired from his long term job with the City of
Springfield due to failed drug testing and he lost a job in
August 2002 because his employer's business shut down.
Thus, one sees that the claimant discontinued employments
for reasons not associated with physical or mental
disability, which further raises a question of secondary
gain herein.  Based upon the disability evaluation of the
claimant on September 11, 2003, Dr. Lennard, a physical and
rehabilitation specialist, noted the claimant to have full
range of motion of both upper and lower extremities in his
examination.  Dr. Lennard completed a Medical Source
Statement-Physical form in which he assessed the claimant to
have the residual functional capacity to perform light work.
The claimant was evaluated by Dr. Carter, Psy.D., at the
Lakes Country Rehabilitation Center in May 2003, at which
time his MMPI-2 testing showed an invalid profile,
indicating a "rather unsophisticated attempt on the part of
the test taker to present himself in a favorable light" and
that the claimant "stopped paying attention to the test
items that occurred later in the booklet, and shifted to a
more random pattern of responding."  The claimant did not
follow the vocational rehabilitation recommendations to
obtain a high school equivalency diploma and pursue
vocational rehabilitation.

(Tr. at 18-21).

The ALJ found that plaintiff retains the residual functional

capacity to lift and/or carry ten pounds; stand or walk for two

hours per day; sit for six hours per day with a sit/stand option

at 30 minute intervals; cannot crawl, crouch, or kneel; cannot

reach overhead with his upper extremities; should avoid climbing

47

and other exposure to unprotected heights, dangerous and
unguarded moving machinery and commercial driving; should work in
a climate controlled environment with even surfaces; is limited
to simple, repetitive instructions with no customer service and
minimal contact with co-workers and supervisors; and is able to
attend a workplace for a full eight hours without the need for
excessive or unusual breaks (Tr. at 22). Plaintiff has mild
restriction of activities of daily living; mild difficulties in
maintaining social functioning; moderate difficulties in
concentration, persistence, or pace; and has had no episodes of
decompensation of extended duration (Tr. at 22). Plaintiff
retains the basic mental capacity required for competitive,
remunerative work, can read and write (Tr. at 22). He therefore
retains the residual functional capacity to perform sedentary
work (Tr. at 22).

With this residual functional capacity, plaintiff cannot
perform his past relevant work (Tr. at 23).

Step five. Plaintiff is able to perform other work in
significant numbers in the economy (Tr. at 23). Plaintiff can be
a final assembler, with 667,000 jobs in the country and 1,400
jobs in Missouri; or a machine packager at the sedentary level,
with 3,000 jobs in the country and 100 jobs in Missouri (Tr. at
23).

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 48 of 65

## VI. DE MINIMUS STANDARD

Plaintiff argues that the ALJ erred in finding that plaintiff's headaches did not constitute a severe impairment. Instead, the ALJ found that plaintiff's headaches were controlled with treatment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a). Basic work activities encompass the abilities and aptitudes necessary to perform most jobs. Included are physical functions such as walking; standing; sitting; lifting; pushing; pulling; reaching; carrying; handling; seeing; hearing; speaking; understanding, performing, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work situation. 20 C.F.R. § 404.1521(b).

Plaintiff's burden of establishing a severe impairment is minimal. <u>Caviness v. Massanari</u>, 250 F.3d 603 (8th Cir. 2001). An impairment should be identified as non-severe only if it is no more than a slight abnormality that does not significantly limit any basic work activity. <u>Bowen v. Yuckert</u>, 482 U.S. 137 (1987); <u>Brown v. Bowen</u>, 827 F.2s 311 (8th Cir. 1987).

49

Plaintiff's alleged onset date is April 4, 2004. The records reflect that he was being treated for headaches prior to that time. On June 28, 2004, plaintiff had his last visit with the headache management program and reported that the number and intensity of headaches had gotten better. On June 29, 2004, during a follow-up on his headaches, he stated that he had noted a significant improvement, both in intensity and frequency. On July 19, 2004, plaintiff had another follow up for his headaches. The medical records report that "[o]verall, he states they are doing well. He reports there has been no major headache flare ups and that they are minimal if they do occur." On August 3, 2004, he reported that the Effexor was helping his headaches. There are no other complaints of headaches in the medical record.

Plaintiff testified on July 7, 2005, that he has a couple headaches every couple of months[41] (Tr. at 412). He also testified that he takes over-the-counter Excedrin Migraine for his headaches.

The substantial record as a whole supports the ALJ's determination that plaintiff's headaches do not constitute a

_____

[41]In his brief, plaintiff argues that he testified at the hearing in July 2005 that he continued to experience headaches a couple times a month, and cites to page 258 of the transcript. Page 258 is a medical record dated July 19, 2004. On page 412 of the transcript, plaintiff testified that he used to have three or four headaches a week. When asked about "now", since he had been on medication, he said, "A couple, a couple of months maybe."

50

severe impairment.  Additionally, there is no question that
plaintiff's headaches did not continue for at least twelve
consecutive months, other than his getting a couple of headaches
every couple of months.  A couple of headaches every couple of
months would not significantly limit any basic work activity.

For this reason, plaintiff's motion for summary judgment on
this basis will be denied.

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ erred in finding that
plaintiff could perform sedentary work limited to simple,
repetitive tasks with no customer service and minimal contact
with co-workers and supervisors[42] because although the ALJ
provided a brief summary of the medical evidence before providing
the RFC, she failed to indicate what evidence she specifically
relied upon in making the determination.  Specifically, plaintiff
points out that he was experiencing side effects of methadone
including hot flashes, nausea, and problems with constipation;
his pain management doctor indicated that plaintiff's prognosis
to return to work was poor; a psychologist indicated that
plaintiff was in grave need of antidepressant medications; and

---

[42]This limitation is surprising since plaintiff himself told
Dr. Carter, who performed personality testing as part of a
comprehensive vocational evaluation to assist with vocational
planning, that he could "meet the public, work closely with
others or independently." (Tr. at 229-232).

51

that a doctor and a nurse believed that plaintiff would need to learn to cope with his pain in order to return to work.

Side effects.  Although plaintiff testified about side effects, the ALJ found that plaintiff's testimony was not credible.  Plaintiff complained of constipation in May 2004 and was given a prescription for lactulose.  There is no further mention of constipation in the medical records.  Plaintiff never complained of hot flashes to any doctor or nurse, and he did not indicate to any treating professional that he experienced any stomach problems.

I also note that plaintiff testified that he could only drive if he was not taking his medications because they cause problems with memory, confusion, and drowsiness.  There are no complaints of any of these side effects to any of plaintiff's treating physicians or nurses in the record before me.

There is no credible evidence that plaintiff suffered from any side effects that would interfere with his ability to work.

Poor prognosis.  In August 2004, Dr. Pak made the following notation in his medical records:  "He does not feel that he can return to any kind of work, therefore, prognosis for vocational return appears poor."  Plaintiff had told Dr. Pak on that visit that he was trying to get disability benefits.  Dr. Pak observed that plaintiff probably did have significant arthritic problems

52

and limitations, but "his degree of pain and debility seems out of proportion to what would be expected from physical reasons alone." Dr. Pak also counseled plaintiff on the detriments of continuing to smoke, not only for his overall health, but for improved health of his joints. It is clear from the medical record that Dr. Pak believed plaintiff's prognosis was poor only because plaintiff refused to believe he could work and insisted on getting disability benefits instead.

Grave need of antidepressants. On March 19, 2004, Deborah Kukal, Ph.D., noted that plaintiff was in grave need of antidepressant medication and spoke to plaintiff at length about his "shame and self-loathing that he would need an antidepressant". This was a result of plaintiff telling Dr. Kukal that he is very much against antidepressants because taking antidepressants is a sign of weakness.

As mentioned in the statement of facts above, at the time plaintiff made this statement, he had previously been prescribed and taken Trazodone, Zoloft, Paxil, Xanax, and Lexapro, all antidepressants. Plaintiff had been taking Trazodone fairly regularly, at least during 2003 and 2004; and he told Colleen Baker on March 19, 2004 -- the same day he told Dr. Kukal that he was very much against antidepressants -- that he was currently taking Trazodone. Plaintiff got a refill of Paxil on April 23,

53

2004 -- about a month after he told Dr. Kukal he was very much against antidepressants -- and the records do not establish that his original Paxil prescription was <u>after</u> March 19, 2004, which suggests that plaintiff was taking Paxil at the time he told Dr. Kukal he was very much against antidepressants.  Dr. Crow refilled plaintiff's Trazodone on December 6, 2003; plaintiff told Dr. Lennard on September 11, 2003, that he was taking Trazodone and Zoloft; he told Dr. Carter in May 2003 that he had been prescribed Trazodone, Paxil, and Xanax in 1996 due to depression from his divorce, and that they worked well.

I note here a few things with respect to plaintiff's visit to Dr. Kukal:  (1) She observed that his "significant pain behaviors" exhibited when he arrived decreased as he became involved with the testing, leading one to suspect he was exaggerating his pain behaviors; (2) plaintiff told Dr. Kukal that he had gone through vocational rehabilitation and had been told the he could only be a ticket taker when in fact he had made the decision he did not want to proceed any further with Vocational Rehabilitation services until his application for disability benefits had been decided; (3) all of the tests relied upon by Dr. Kukal were "self report" tests; i.e., the TAS is a "self-report inventory", the Symptom Checklist is a "self-report checklist" wherein patients endorse symptoms, the MPI is a "self-

54

report instrument" assessing the patient's typical pain coping pattern. Because it appears that plaintiff was less than truthful with Dr. Kukal, her findings and recommendations may be suspect. In addition, the mere fact that plaintiff was already taking antidepressant medication when Dr. Kukal found that he was in grave need of antidepressant medication would also suggest that her findings be somewhat discredited.

Need to cope with pain. Plaintiff argues that the ALJ ignored the full extent of plaintiff's pain and points out that (1) Nurse Webb noted that plaintiff would need to learn to cope with his pain before he could return to work, (2) Darron Acklin with the Missouri Department of Economic Development indicated that plaintiff could not obtain meaningful employment due to his medical condition, and (3) plaintiff testified that he needs to lie down when he has a headache and he needs to prop up his legs with a pillow under his knees.

Nurse Webb. Crystal Webb, R.N., of the Pain Management Center stated that "it is our hope at this point that this patient would in some way learn how to cope with his medications and his pain enough that he would be able to return to work." (Tr. at 263). Ms. Webb's statement was in response to plaintiff's insistence that he needed disability paperwork completed, despite his doctor's belief that plaintiff was capable

55

of working. She even concluded with the following: "I think that actual disability process has forbidden this person from being able to have a successful resolution from his pain"; in other words, plaintiff was trying harder to get disability than he was to get better.

Darron Acklin. Plaintiff points out that Darron Acklin with the Missouri Department of Economic Development indicated that plaintiff could not obtain and maintain meaningful employment due to his medical condition. This was based on Mr. Acklin's observation that defendant could only sit for five to seven minutes at a time.

First, Mr. Acklin is not a doctor. Second, even plaintiff, in his disability application paperwork, indicated that he could sit upright for up to two hours (Tr. at 119); and he testified at the administrative hearing that he could sit for 30 minutes to an hour (Tr. at 418). It seems apparent that plaintiff was exaggerating his symptoms during his meeting with Mr. Acklin.

Plaintiff's credibility. The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803

56

(8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the <u>Polaski</u> opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are quoted above along with the ALJ's findings.

There is no question that plaintiff has an excellent work record. However, as the ALJ pointed out, plaintiff's last job ended when the business closed, and the job he had before that for more than 21 years ended with defendant's being fired after testing positive for marijuana use. The fact that plaintiff is unemployed due to reasons other than his impairments supports the ALJ's finding that plaintiff's subjective complaints of disabling pain are not entirely credible.

Plaintiff's daily activities include doing laundry, doing dishes, making beds, changing sheets, vacuuming, sweeping, taking out the trash, mowing the lawn, shopping, preparing breakfast and lunch, cleaning bathrooms, and driving (Tr. at 121-122). The record establishes that while plaintiff was claiming he was disabled, he went hunting and drug a 30-pound bobcat back home in January 2004 (Tr. at 171); he was able to mow his yard with a push mower in May 2004 (Tr. at 354); he was able to do his activities of daily living as well as increase his activities in the yard in June 2004 (Tr. at 311); on August 3, 2004, plaintiff went out fishing and threw the boat's anchor into the water (Tr. at 278-279), then three days later he told Dr. Pak that his

58

activities were fairly sedentary (Tr. at 276-277). About a month after that, he told Dr. Kelso that he had been throwing an eight-pound weight (Tr. at 255-256). Clearly plaintiff's activities were not as sedentary as he told Dr. Pak, who observed that plaintiff's degree of pain and debility "seems out of proportion to what would be expected from physical reasons alone."

Plaintiff's daily activities are inconsistent with having the level of pain and disability he claims he suffers.

In June 2004, plaintiff told Crystal Webb, R.N., that he was getting good relief with his medications (Tr. at 311).

In May 2004 Nurse Tiede recommended that plaintiff walk for 30 to 45 minutes per day five to seven times per week (Tr. at 295). In March 2004 Dr. Kukal advised plaintiff to exercise. There are no physical limitations in the record, i.e., no doctor has ever limited plaintiff's sitting, walking, or standing.

In May 2003 Dr. Carter could not interpret plaintiff's MMPI-2 because of his "rather unsophisticated attempt" to present himself in an untruthful light. In June 2003, plaintiff refused to proceed with a vocational plan until he found out whether he was going to be awarded Social Security disability benefits. In December 2003 plaintiff told Dr. Crow that he was trying to get disability "due to the fact he is uneducated". On that visit, plaintiff's left knee appeared "quite stable" to Dr. Crow, and

59

the examination of plaintiff's right knee was "essentially normal." In March 2004 plaintiff reported to Colleen Baker that he was kicked out of vocational rehabilitation two months before he was supposed to graduate because a foreman had not filled out the paperwork for him on some vocational courses he was taking (Tr. at 194-196). Plaintiff told Dr. Kukal that he completed vocational rehabilitation and was told he could only be a ticket taker at the movies. And plaintiff told Jim Patterson in June 2003 that he did not want to proceed with vocational rehabilitation until he learned whether his disability application would be granted. Plaintiff testified that he has difficulty sleeping because of shoulder pain, but in June 2004 he missed a 9:00 a.m. appointment in the headache management program because he overslept (Tr. at 284).

In September 2003, Dr. Lennard found that plaintiff had normal range of motion in all extremities. In January 2004 plaintiff had almost full active range of motion in his shoulders, and this was before his latest shoulder surgery. In addition, the x-rays of his right knee and right shoulder were normal. In January 2005, four weeks after his right shoulder arthroscopy, plaintiff had good motion and was very pleased (Tr. at 246). In March 2005 plaintiff told Dr. Harbach that his shoulder was "doing pretty well." (Tr. at 245).

60

In June 2004 when plaintiff saw Dr. Yantis for headaches, the doctor observed that plaintiff had a normal gait (Tr. at 260-261). Seven months later, plaintiff walked into Dr. Ellis's office hoping to have disability forms completed, and at that time his gait was observed to be severely antalgic (Tr. at 263). The fact that plaintiff's gait is normal when he is being seen for headaches and is severely antalgic when he is being seen for completion of disability paperwork suggests that he was exaggerating his gait in Dr. Ellis's office.

Plaintiff has continued to smoke a pack of cigarettes per day while claiming he does not have the money to participate in physical therapy, which could lessen his pain. In fact, Colleen Baker at the Center for Pain Management observed that plaintiff was moving his arms incorrectly which could be increasing his problems with his shoulders, yet he continued to insist on doing his own physical therapy at home. Furthermore, Dr. Pak counseled plaintiff on the detrimental effects of smoking not only on his overall health but on his musculoskeletal health (Tr. at 276-277).

The substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling pain are not entirely credible. Therefore, the ALJ was not required to incorporate plaintiff's non-credible complaints

in her RFC determination.

"The Commissioner must determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." McGeorge v. Barnhart, 321 F.3d 766, 767 (8th Cir. 2003). The ALJ properly discussed all of the evidence prior to determining plaintiff's RFC. Therefore, because the ALJ's RFC determination was based on all of the credible evidence in the record, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. VOCATIONAL EXPERT TESTIMONY

Finally, plaintiff argues that the ALJ improperly found that plaintiff could perform the jobs of final assembler or machine packager because those jobs, according to the Dictionary of Occupational Titles, require abilities that the ALJ found plaintiff does not have, specifically overhead reaching and the ability to concentrate beyond that found by the ALJ.

Social Security Ruling ("SSR") 00-4p requires the ALJ to identify and obtain a reasonable explanation for any conflict between occupational evidence provided by a vocational expert and information in the Dictionary of Occupational Titles ("DOT"). "When there is an apparent unresolved conflict between the [vocational expert] and the DOT, the adjudicator must elicit a

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 62 of 65

reasonable explanation for the conflict before relying on the [vocational expert's] evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p. In this case the ALJ did ask the vocational expert about any conflicts with her testimony and the DOT. There were no conflicts; however, the vocational expert testified that the DOT does not address the issues of commercial driving, overhead reaching, walking on uneven surfaces, a sit/stand option, and contact with customers and co-workers (Tr. at 429). It was based on the vocational expert's experience that she testified a person with the limitations as those found by the ALJ could perform the jobs of machine operator and final assembler.

The DOT defines reaching as "extending hand(s) and arm(s) in any direction." The ALJ asked the vocational expert whether the hypothetical individual could perform work if he could perform no overhead reaching (Tr. at 428). The vocational expert testified that in her experience, she believed that a person with the limitations outlined by the ALJ, including the inability to reach overhead, could perform these jobs.

The DOT states that the position of machine operator requires a reasoning level of two and cannot be classified as "simple instructions", which is, according to the ALJ, what plaintiff is limited to. First I note that there really is no

63

credible evidence in this record to support such a limitation.
Plaintiff did not complain to his doctors of any side effects
from medication, yet he testified at the hearing that his loss of
concentration was caused by his medication. Had the ALJ found
that testimony not credible, the record easily would have
supported that finding. In any event, as the defendant points
out, even if plaintiff were given the benefit of this argument,
this would still leave the packager job as a job in significant
numbers that he could perform. See Jenkins v. Bowen, 861 F.2d
1083, 1087 (8th Cir. 1988) (500 jobs a significant number);
Trimiar v. Sullivan, 966 F.2d 1326, 1330 (10th Cir. 1992) (650 to
900 jobs in Oklahoma was a significant number); Craigie v. Bowen,
835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs was a significant
number).

Because the hypothetical included those impairments which
the ALJ found credible and excluded only those impairments which
were discredited for a legally sufficient reason, it satisfied
the Commissioner's burden of showing that plaintiff's impairment
does not prevent him from doing any other work.

## IX. *CONCLUSIONS*

Based on all of the above, I find that the substantial
evidence in the record as a whole supports the ALJ's finding that
plaintiff is not disabled. Therefore, it is

64

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


 /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 28, 2008

Case 6:07-cv-03029-REL   Document 17   Filed 01/28/08   Page 65 of 65